NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 231064-U

NO. 4-23-1064

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 13, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| PEGGY MAAS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Peoria County |
| THE BOARD OF EDUCATION OF PEORIA | ) | No. 18LM1700 |
| PUBLIC SCHOOL DISTRICT 150, | ) | |
|     Defendant-Appellant. | ) | Honorable |
| | ) | Paul E. Bauer, |
| | ) | Stewart J. Umholtz, |
| | ) | Judges Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Cavanagh and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in granting plaintiff's motion for summary judgment
and denying defendant's cross-motion for summary judgment.

¶ 2    Defendant, the Board of Education of Peoria Public School District 150, appeals

the trial court's judgment finding it violated the Illinois Wage Payment and Collection Act

(Wage Act) (820 ILCS 115/1 *et seq.* (West 2018)) and awarding plaintiff, Peggy Maas,

$136,273.07 in damages pursuant to the statute. On appeal, defendant argues the court erred in

entering judgment for plaintiff because (1) plaintiff failed to establish she was entitled to the

employee benefit at issue where she did not follow its past practice regarding enrollment in the

benefit or, alternatively, (2) her claim was barred by the doctrine of *laches* because she waited

seven years to notify defendant of her enrollment and it was prejudiced as a result. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          In June 2019, plaintiff filed an amended complaint against defendant seeking reimbursement and damages under the Wage Act. She alleged defendant legally committed itself through its collective bargaining agreement (CBA) with the teachers union to pay her health insurance premiums from the time of her retirement in June 2010 until she became Medicare eligible in January 2018. However, in the fall of 2017, plaintiff learned the premium payments were instead being deducted from her monthly pension annuity and had been since her retirement in 2010. She requested reimbursement of the amount she had paid, but defendant denied her request. According to the complaint, defendant "justified its denial of reimbursement citing a clerical error made at the time of [plaintiff's] retirement." Plaintiff alleged defendant's refusal to reimburse her amounted to a breach of the CBA and a violation of the Wage Act because the insurance premiums were "wage supplements," as defined in the statute, to which she was entitled. See 820 ILCS 115/2, 8, 14 (West 2018). For relief, plaintiff sought (1) reimbursement of the insurance premiums defendant should have paid pursuant to the CBA, (2) statutory damages, (3) pre and postjudgment interest, and (4) attorney fees and costs.

¶ 5          In May 2022, the parties filed cross-motions for summary judgment. The parties attached to their motions, among other things, a transcript of plaintiff's deposition, a copy of the CBA, a transcript of the deposition of Geralyn Hammer, defendant's director of employee services, a sworn affidavit by Hammer, and a copy of a "CMS Enrollment Form" relating to the employee benefit at issue. The following facts from the pleadings, motions, and attached exhibits are undisputed.

¶ 6          Plaintiff was employed by defendant as a teacher until her retirement on June 5, 2010. At the time of her retirement, plaintiff was a member of the Peoria Federation of Teachers

Local #780 (Union). Defendant and the Union were bound by the CBA. Article IX, section J, of the CBA provides, in relevant part, as follows:

"J. *Retirement Insurance Program*—Employees meeting the minimum requirements of age and creditable service in Illinois *** shall qualify for the Retirement Insurance Program.

* * *

Except as noted below, retirees may not participate in [defendant's] plan, but may enroll in the Teachers' Retirement Health Plan (TRIP). For those employees enrolled in TRIP, [defendant] will pay toward insurance coverage the lesser of the amount paid on behalf of active employees or the actual amount of the TRIP individual premium.

***

*** [Defendant's] obligation hereunder shall continue until the retiree is Medicare eligible."

Plaintiff enrolled in TRIP—which is administered by the Teachers' Retirement System (TRS), not defendant—effective July 1, 2010. She enrolled by completing the first seven of eight sections of the "CMS Enrollment Form" (TRIP application) and submitting it to TRS. Section 7 of the TRIP application, titled "Authorized signature," states in pertinent part, "I authorize [TRS] to deduct the cost of this coverage from my annuity." Plaintiff signed and dated section 7, May 20, 2010. Section 8, which is titled, "School district authorization for paying premium," states, in part, "If the school district is paying your portion of the monthly premiums ***, the district representative must complete the appropriate information and sign the appropriate line. The district representative must also identify the district name and TRS code." Plaintiff mailed her

TRIP application directly to TRS without first having section 8 completed by defendant. In the fall of 2017, plaintiff discovered that defendant had not paid any of her insurance premiums following her retirement and enrollment in TRIP. Instead, the premium was being deducted from her monthly pension annuity payment, which she received via direct deposit into her bank account. TRS sent plaintiff annual statements that showed the deductions, but she admitted that she did not review the statements before sending them to her tax preparer. Plaintiff contacted Hammer to request reimbursement of the total premiums she had personally paid, but Hammer denied plaintiff's request for reimbursement.

¶ 7        Geralyn Hammer testified she was employed as defendant's director of employee services and had been since November 2004. As part of her duties, Hammer oversaw employee insurance and provided employees with information regarding their health insurance options, including enrollment in TRIP. Hammer coordinated informational meetings each year for certified staff members nearing retirement. One meeting would be held in October, and a second in May each year. On April 12, 2010, Hammer sent an "All Staff" e-mail notifying TRS retirees that a TRS meeting, with a TRS representative in attendance, would be held on May 20, 2010. In part, the e-mail stated: "If you have any questions for TRS about your retirement or if you need to fill out forms to continue the ancillary insurance programs those forms will be there also." Hammer attended the May 20, 2010, meeting, along with defendant's insurance specialist. Hammer collected any forms submitted by retiring employees at the meeting. Plaintiff also attended this meeting, although she could not recall any specific details about it.

¶ 8        Hammer explained that to enroll in TRIP, a retiree must complete the TRIP application and sign section 7, which authorizes TRS to deduct the insurance premiums from the retiree's monthly retirement annuity. If the retiree wishes to have defendant pay their premiums,

- 4 -

the retiree must provide defendant with the TRIP application so it can fill out section 8 and then submit the application to TRS. Hammer testified that not all retirees choose to enroll in TRIP and instead utilize other forms of health insurance coverage. Hammer stated there had been several instances in which a retiree failed to submit the TRIP application to defendant, but, after being contacted by the retiree, defendant was able to obtain the application and complete section 8, submit it to TRS, and pay the premiums going forward. Hammer testified that when this occurred, the retiree would usually contact defendant after receiving their first pension check and noticing such a large deduction from it. As of July 2010, defendant was paying the TRIP premiums for 221 retirees, all of whom provided defendant with the TRIP application to complete and submit to TRS. Defendant began offering this employee benefit in 2006.

¶ 9        Hammer testified plaintiff contacted her in the fall of 2017 and asked why defendant had not been paying her TRIP premiums. Hammer looked into the matter and discovered defendant did not have plaintiff's TRIP application on file. Hammer then contacted TRS on October 4, 2017, to request a copy of plaintiff's application. TRS informed her that plaintiff had not authorized it to share this information with defendant. Plaintiff subsequently authorized TRS to provide defendant with her application, which it did on October 11, 2017. Upon receiving plaintiff's TRIP application, Hammer discovered plaintiff had submitted it directly to TRS with only the first seven sections completed, neglecting to have defendant complete section 8. On November 13, 2017, Hammer sent a letter to plaintiff stating the following:

> "After investigating the circumstances, we have determined that
> [defendant] is under no obligation to reimburse you for the premiums you
> paid since retirement. When you retired, you failed to notify [defendant]

that you enrolled in TRIP; and further, you failed to authorize [TRS] to release information to [defendant] regarding your enrollment such that [defendant] could pay the premium."

Hammer testified that defendant denied plaintiff's request for reimbursement of the TRIP premiums she had paid "[b]ecause of the volume and also because of insurance. They always give us even on our own insurance we have a three-month lag. We can go back and reenroll somebody or terminate somebody back of three months. That's the 90-day rule with insurance even when you're active."

¶ 10    In her motion for summary judgment, plaintiff summarized her position as follows:

"Because [defendant] committed to paying the TRIP premiums, which are employee benefits, through the CBA, they are considered 'wage supplements' under the [Wage Act] and subject to collection thereunder. Further, because the plain language of the CBA does not contain the time limitations or waiver that [defendant] is trying to enforce against [her] to deny her request for payment of her TRIP premiums, judgement must be entered in [her] favor and against [defendant]."

¶ 11    Defendant raised the following arguments in its motion for summary judgment: (1) plaintiff was not entitled to payment of her insurance premiums because she failed to follow defendant's past practice regarding enrollment in TRIP by failing to properly complete the TRIP application and notify defendant of her enrollment in the program, (2) plaintiff's claim was barred by the doctrine of *laches* because she did not inform it of her June 2010 enrollment until fall 2017, and (3) the trial court lacked subject-matter jurisdiction.

¶ 12    On July 29, 2022, following a hearing on the parties' cross-motions for summary judgment, the trial court entered a written order granting plaintiff's motion for summary judgment and denying defendant's motion. The court made the following findings: (1) it had subject-matter jurisdiction; (2) "*Laches* does not apply. Assuming *arguendo* that Plaintiff unreasonably delayed in bringing suit, Defendant did not prove any prejudice"; and (3) "Defendant provided no authority for its assertion that its 'established practices' would override the terms of the CBA nor did it prove any such practices in the relevant time period from 2006 to 2010." The court awarded plaintiff $18,816.73, representing the total TRIP premiums paid by plaintiff, "plus monthly statutory damages, pre-judgment and post-judgment interest, costs, and reasonable attorney's fees, subject to 1% daily interest 36 days after entry of the final damages award." The court's order concluded as follows: "Plaintiff shall submit her costs and attorney's fees within 7 days. Both parties shall have 14 days to submit their position on which version of [section 14(a) of the Wage Act] applies to this case. This cause is continued to Sept[ember] 1, 2022, *** to address the final damages award."

¶ 13    On August 4 and 12, 2022, respectively, plaintiff submitted her costs and attorney fees, and the parties submitted written arguments on whether a 2021 amendment to section 14(a) of the Wage Act should be applied retroactively or prospectively. The amendment changed the statutory damages award for a Wage Act violation from 2% of the amount of the underpayment to 5%.

¶ 14    On August 29, 2022, before the trial court determined plaintiff's final damages award, defendant appealed the court's July 29, 2022, order. On appeal, we concluded the trial court was correct in finding it had subject-matter jurisdiction, but the order appealed from was not a final order because the court had yet to determine the final damages award. *Maas v. Board*

*of Education of Peoria Public School District 150*, 2023 IL App (4th) 220773-U, ¶¶ 16-25.

Therefore, we dismissed the appeal for a lack of appellate jurisdiction. *Id.* ¶ 25.

¶ 15           On September 18, 2023, the trial court entered a judgment awarding plaintiff a

total of $136,273.07.

¶ 16           This appeal followed.

¶ 17                                    II. ANALYSIS

¶ 18           On appeal, defendant argues the trial court erred in granting plaintiff's motion for

summary judgment and denying its own motion for summary judgment because the undisputed

facts demonstrate that (1) plaintiff was not entitled to payment of her TRIP premiums where she

failed to follow defendant's "past practice" regarding enrollment in TRIP or, alternatively,

(2) her claim was barred by the doctrine of *laches* because she waited seven years to notify

defendant of her enrollment and it suffered prejudice as a result of plaintiff's unreasonable delay.

¶ 19                              A. Summary Judgment

¶ 20           Where, as here, "parties file cross-motions for summary judgment, they agree that

only a question of law is involved and invite the court to decide the issues based on the record."

*Pielet v. Pielet*, 2012 IL 112064, ¶ 28. "However, the mere filing of cross-motions for summary

judgment does not establish that there is no issue of material fact, nor does it obligate a court to

render summary judgment." *Id.* Summary judgment is to be granted only "if the pleadings,

depositions, and admissions on file, together with the affidavits, if any, show there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." 735 ILCS 5/2-1005(c) (West 2018). "A genuine issue of material fact precluding summary

judgment exists where the material facts are disputed or, if the material facts are undisputed,

reasonable persons might draw different inferences from the undisputed facts." *Mashal v. City of*

*Chicago*, 2012 IL 112341, ¶ 49. "Where a case is decided through summary judgment, our review is *de novo*." *Pielet*, 2012 IL 112064, ¶ 30.

¶ 21                                     B. "Past Practice"

¶ 22          First, defendant argues:

> "The trial court erred in finding that Plaintiff was entitled to have her TRIP premiums paid by [defendant] where the undisputed facts, and Plaintiff's own admissions, demonstrate that she failed to follow [defendant's] past practice and failed to properly execute the form *as required by TRS* to properly bill [defendant] for Plaintiff's TRIP premiums." (Emphasis in original.)

Defendant contends it established that its past practice was to only provide the benefit to those retirees who timely submitted the TRIP application to it for completion of section 8 before submitting it to TRS. In essence, defendant argues that plaintiff failed to comply with an implied term of the CBA that defendant's obligation to pay her premiums was dependent on her having all 8 sections of the TRIP application *timely* completed and submitted to TRS—and she therefore was not entitled to the employee benefit.

¶ 23          Plaintiff, on the other hand, argues that the CBA does not contain any time limitations or waiver provisions, but only requires a retiree be enrolled in TRIP to be entitled to the premium payment. She asserts that "it is a giant—and unsupported—leap to *** claim that Defendant can create a self-imposed and uncommunicated *time limit* for when *** notification must be received and that a retiree *forfeits or waives* their right to the benefit by not providing notification within said time limit." (Emphases in original.). According to plaintiff, defendant presented no evidence proving

"that from 2006 through 2010 it clearly and unequivocally informed teachers that: (a) they were required to provide the TRIP application to Hammer prior to submitting it to TRS; (b) there was a deadline for providing Hammer the TRIP application; and (c) if they missed the deadline, they would be forfeiting their right to have Defendant pay their TRIP premiums."

¶ 24    Section 2 of the Wage Act provides that when "an employer is legally committed through a [CBA] *** to make contributions to an employee benefit ***, the amount due from the employer to such employee benefit *** shall be defined as 'wage supplements', subject to the wage collection provisions of this Act." 820 ILCS 115/2 (West 2018); see also *id.* § 8 ("Where an employer is legally committed through a [CBA] *** to make contributions to an employee benefit ***, the amount due from the employer to such employee benefit *** shall be treated as wages, subject to the wage payment provisions of this Act."). Section 14 of the statute provides that

"[a]ny employee not timely paid *** wage supplements by his or her employer *** shall be entitled to recover *** in a civil action *** the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid." *Id.* § 14(a).

Thus, to state a claim under the Wage Act, plaintiff was required to prove the following elements: (1) defendant was an "employer" as defined in the statute; (2) the parties entered into an employment contract or agreement; (3) defendant was legally obligated through the CBA to make contributions to plaintiff's health insurance premiums—*i.e.*, the wage supplements; and (4) plaintiff was not timely paid the wage supplements due to her. *Id.* §§ 2, 14(a); see also

- 10 -

*Catania v. Local 4250/5050 of Communications Workers of America*, 359 Ill. App. 3d 718, 724 (2005). Defendant contests only the third element.

¶ 25    Here, the CBA, in pertinent part, provides the following:

"J. *Retirement Insurance Program*—Employees meeting the minimum requirements of age and creditable service in Illinois *** shall qualify for the Retirement Insurance Program.

* * *

Except as noted below, retirees may not participate in [defendant's] plan, but may enroll in the Teachers' Retirement Health Plan (TRIP). *For those employees enrolled in TRIP, [defendant] will pay toward insurance coverage the lesser of the amount paid on behalf of active employees or the actual amount of the TRIP individual premium.*

***

*** [Defendant's] obligation hereunder shall continue until the retiree is Medicare eligible." (Emphasis added.)

It is undisputed that the plain language of the CBA contains no time limit for enrollment or a waiver provision. It is also undisputed that plaintiff enrolled in TRIP by completing the first seven sections of the TRIP application and submitting it to TRS. Thus, plaintiff argues she established her entitlement to the TRIP premium benefit under the CBA and a *prima facie* case for reimbursement under the Wage Act. Defendant asserts it established a "past practice" that constituted an implied term of the CBA—namely, that a retiree must *timely* submit the TRIP application to defendant—and that because plaintiff failed to comply with that term, she was unable to establish her entitlement to the premium benefit.

¶ 26　　　Defendant argues the evidence set forth below established its past practice and rebutted plaintiff's claim of entitlement. It points to Hammer's testimony that from 2006 to 2010, she coordinated informational meetings for retirees twice per year—once in October and again in May. On April 12, 2010, Hammer sent an "All Staff" e-mail notifying potential retirees of a TRS informational meeting to be held on May 20, 2010, with a TRS representative in attendance. That e-mail stated, in part: "If you have any questions for TRS about your retirement or if you need to fill out forms to continue the ancillary insurance programs those forms will be there also." Hammer attended the meeting on May 20, 2010, so the retirees could submit their forms to her. Plaintiff also attended the May 20, 2010, meeting, although she could not recall specific details about what was discussed. Defendant also points to section 8 of the TRIP application, entitled, "School district authorization for paying premium," which states, in part, "If the school district is paying your portion of the monthly premium ***, the district representative must complete the appropriate information and sign the appropriate line. The district representative must also identify the district name and TRS code." Finally, as of July 2010, defendant was paying the TRIP premiums for 221 retirees, all of whom provided defendant with the TRIP application to complete and submit to TRS. According to defendant, "These facts establish that [it] notified Plaintiff of the steps necessary to successfully submit her retirement paperwork, including the [TRIP application], and provided her with the tools to do so."

¶ 27　　　We find the evidence recited above does not prove defendant had an established past practice regarding TRIP enrollment that constituted an implied term of the CBA. All that the above evidence proves is that defendant held informational meetings for its retirees, at which the retirees were given the opportunity to ask a TRS representative questions about retirement and to submit certain forms to defendant. Defendant cannot point to any evidence in the record

revealing specific information that was conveyed at the May 20, 2010, meeting, or that at any point in time it informed plaintiff or others that they were required to submit their TRIP application to it by a date certain or risk forfeiting their right to the benefit entirely. Moreover, the TRIP application itself does not identify a time limitation, nor does it discuss the possibility of a retiree forfeiting their right to direct payment of their premiums by submitting a tardy application. The fact that defendant was paying the TRIP premiums for 221 of its retirees—all of whom submitted a TRIP application to defendant—as of July 2010 is likewise unavailing. That fact is not helpful without further context. For example, it might further defendant's position if it had also produced evidence that, including plaintiff, only 222 retirees had enrolled in TRIP and plaintiff was the lone individual who failed to have defendant pay her premium. However, defendant presented no such evidence. Ultimately, as plaintiff stated in her brief:

> "There is absolutely no written or [testimonial] evidence showing that Plaintiff— or *any* of Defendant's teachers—was ever informed that a retiree must provide the TRIP application to Hammer by a date certain or the retiree would waive all right and entitlement to payment of her TRIP premiums by Defendant for the rest of the retiree's life." (Emphasis in original.).

The trial court properly rejected defendant's assertion regarding the existence of a "past practice" requiring plaintiff and others similarly situated to submit their TRIP application to defendant within a specified period of time or risk a potential forfeiture of the employee benefit. Accordingly, the court did not err in finding plaintiff had established a claim under the Wage Act.

¶ 28                                        C. *Laches*

¶ 29    Next, defendant argues that even if plaintiff established the elements of a claim under the Wage Act, the trial court erred in failing to find her claim was barred by the doctrine of *laches*. Defendant contends plaintiff failed to exercise due diligence by unreasonably waiting seven years to notify it of her enrollment in TRIP. Defendant claims the prejudice it suffered is "self-evident," and it goes on to state that "the prejudice is having to expend taxpayer dollars to correct Plaintiff's mistake more than seven years after her retirement." Defendant also maintains plaintiff is receiving a windfall through statutory interest and attorney fees and costs, in addition to the reimbursement amount.

¶ 30    *Laches* is an affirmative defense that "may be asserted against a plaintiff who has knowingly 'slept' on its rights and, thus, is deemed to have acquiesced to the actions of the defendant." *City of Chicago v. Alessia*, 348 Ill. App. 3d 218, 228-29 (2004). Unlike a statute of limitations, which bars an action based on a mere lapse of time, *laches* operates to bar a claim only where "the plaintiff's unreasonable delay in asserting a right or claim has prejudiced and misled the defendant, or caused the defendant to pursue a course of action different from what he would have otherwise taken." *Aiardo v. Village of Libertyville*, 184 Ill. App. 3d 653, 659 (1989). "The doctrine [of *laches*] is grounded in the equitable notion that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party." *Tully v. State of Illinois*, 143 Ill. 2d 425, 432 (1991). "There are two fundamental elements of *laches*: (1) lack of due diligence by the party asserting the claim and (2) prejudice to the opposing party." (Internal quotation marks omitted.) *Tillman v. Pritzker*, 2021 IL 126387, ¶ 25.

¶ 31    Here, even assuming, *arguendo*, defendant can establish plaintiff unreasonably delayed asserting her rights, we find it is unable to prove prejudice. Defendant relies on *Ashley v. Pierson*, 339 Ill. App. 3d 733 (2003), and *Bill v. Board of Education of Cicero School District*

- 14 -

*99*, 351 Ill. App. 3d 47 (2004), in support of its assertion that the inherent prejudice here "is having to expend taxpayer dollars to correct Plaintiff's mistake more than seven years after her retirement."

¶ 32        In *Ashley*, this court cited *City of Chicago v. Condell*, 224 Ill. 595, 598-99 (1906), for the proposition that, "although a party asserting *laches* generally must prove that he was prejudiced by the other party's delay, in cases 'where a detriment or inconvenience to the public will result,' prejudice is inherent." *Ashley*, 339 Ill. App. 3d at 739. We found this proposition persuasive and "h[e]ld that such detriment and inconvenience exists in cases where inmates file petitions for writs of *mandamus* more than six months after the completion of the original [Illinois Department of Corrections (DOC)] disciplinary proceedings." *Id.* "In so holding, we note[d] that DOC houses over 42,000 adult inmates who have little disincentive to litigate over disciplinary proceedings." *Id.*; see *Alicea v. Snyder*, 321 Ill. App. 3d 248, 254 (2001) ("DOC conducts a large number of disciplinary proceedings every year, and the administrative expense and burden of conducting reviews so long after the completion of the original proceedings would be substantial. Such an inquiry would result in extensive public detriment and inconvenience.").

¶ 33        Defendant's reliance on *Ashley* is unpersuasive. The prejudice in *Ashley* was inherent due to the unique situation presented—namely, that DOC housed over 42,000 adult inmates with "little disincentive to litigate over disciplinary proceedings" and the substantial "administrative expense and burden of conducting reviews" so long after the original proceedings. (Internal quotation marks omitted.) *Ashley*, 339 Ill. App. 3d at 739-40. Here, on the other hand, defendant fails to specifically explain the inherent nature of the prejudice. Instead, defendant merely repeats the conclusory assertion that "the prejudice is having to expend taxpayer dollars to correct Plaintiff's mistake more than seven years after her retirement."

Defendant neglects to acknowledge that it bound itself to expend this money when it entered into the CBA, and regardless of whether it paid plaintiff in monthly installments beginning in 2010 or a lump-sum reimbursement amount in 2017, the total amount it was obligated to pay under either scenario *is the same*. Moreover, the facts of this case appear to undermine defendant's position that the prejudice is inherent. Specifically, plaintiff and other individuals similarly situated are clearly incentivized to assert their right to have their former employer pay their health insurance premiums, and defendant repeatedly notes that plaintiff was the only person who waited more than 90 days to assert their right to direct the payment of premiums. Thus, it does not seem likely defendant will face an onslaught of future similar claims, unlike the potential volume of litigation noted in *Ashley*.

¶ 34 Defendant also cites *Bill*. In *Bill*, the plaintiff was hired as a full-time probationary teacher for the 1999-2000 school year but did not receive an assignment for the 2000-01 school year. *Bill*, 351 Ill. App. 3d at 49. In September 2000, the plaintiff contacted a union representative and informed him she had not received a notice of termination from defendant. *Id.* at 50. The union representative informed the plaintiff that the defendant "was required, under section 24-11 of the School Code (105 ILCS 5/24-11 (West 2002)), to provide her with written notice *** advising her whether she would be reemployed for the 2000-01 year." *Id.* Because the plaintiff did not receive such notice, the School Code provided her with the right to a teaching position with defendant for the 2000-01 school year. *Id.* In November 2001, the plaintiff filed a complaint, alleging defendant was required to reemploy her and pay her salary as if she had been employed for the duration of the school year. *Id.* at 51. The plaintiff subsequently filed a motion for summary judgment, which the trial court granted, and the defendant appealed. *Id.* at 51, 53.

¶ 35 On appeal, the defendant argued the plaintiff's claim was barred by the doctrine of *laches* because it was filed 14 months after the union representative informed her of her rights under the School Code. *Id.* at 54. In attempting to establish prejudice, the defendant argued "there is inherent prejudice to a public employer where the employee's delay leads to the payment of both a replacement worker's salary, as well as the plaintiff's back wages, were his action to succeed." *Id.* at 62. The *Bill* court agreed "case law has found an inherent prejudice to exist in such cases," but it did "not believe it has instituted an absolute presumption of prejudice without the establishment of certain facts." (Emphasis omitted.) *Id.* After discussing relevant case law, the *Bill* court found, "contrary to [the] defendant's assertions, no court ever instituted a blanket presumption that such prejudice existed without evidence that a replacement worker had actually been hired and paid for the period identified in the plaintiff's suit." *Id.* at 62-63. Because the defendant failed to present evidence it had hired a teacher to replace the plaintiff for the 2000-01 school year, the *Bill* court concluded the defendant failed to establish prejudice. *Id.* at 63-64.

¶ 36 As with *Ashley*, we find defendant's reliance on *Bill* is unavailing. To begin with, the facts are readily distinguishable. The instant case does not involve "the inherent risk of prejudice to an employer when a public employee delays in seeking reinstatement or back pay." *Id.* at 63. Moreover, the court in *Bill* held that even in situations where the risk of prejudice is inherent, prejudice will not be presumed; instead, a defendant must present evidence of the prejudice that actually resulted. *Id.* at 62-64. Here, not only has defendant failed to present evidence of actual prejudice, it fails to explain how it might even *potentially* be prejudiced, other than by repeating that "the prejudice is having to expend taxpayer dollars to correct Plaintiff's mistake more than seven years after her retirement." Thus, we reject defendant's argument that it

suffered inherent prejudice merely because it had to expend taxpayer dollars to pay plaintiff what she was due under the CBA.

¶ 37 Defendant's only remaining contention is that plaintiff is receiving a windfall and it is prejudiced by having to pay her statutory interest and attorney fees and costs in addition to the reimbursement amount. We disagree. For *laches* to bar a claim, the prejudice suffered must have been caused by the plaintiff's unreasonable delay. See, *e.g.*, *Aiardo*, 184 Ill. App. 3d at 659 ("[A]n action will be barred by *laches* only if the plaintiff's unreasonable delay in asserting a right or claim has prejudiced and misled the defendant, or caused the defendant to pursue a course of action different from what he would have otherwise taken."). Here, whatever delay on the part of plaintiff did not, by itself, result in a windfall at defendant's expense. Instead, what exposed defendant to liability under the Wage Act was its own refusal to reimburse plaintiff in the fall of 2017 following her request. If defendant had simply honored plaintiff's request and reimbursed her for the TRIP premiums she had paid, it would not have found itself later having to also pay interest, attorney fees, and costs. Thus, any alleged windfall was caused by defendant's own actions, not plaintiff's, and we therefore reject defendant's argument. Accordingly, because defendant is unable to prove it suffered any prejudice, we find the trial court did not err in denying its *laches* affirmative defense.

¶ 38 III. CONCLUSION

¶ 39 For the reasons stated, we affirm the trial court's judgment.

¶ 40 Affirmed.